IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES HAVASSY** *individually, and on behalf of all others similarly situated* | : : : | **CIVIL ACTION** |
| **v.** | : : | |
| **KELLER WILLIAMS REALTY, INC., PETER HEWITT and KELLY HOUSTON** | : : | **NO. 21-4608** |

## MEMORANDUM OPINION

**Savage, J.**                                                                           **April 15, 2024**

        Plaintiff James Havassy brings this putative class action under the Telephone Consumer Protection Act (TCPA),[1] against Keller Williams Realty, Inc. ("KWRI") and two real estate agents for making unwanted robocalls soliciting real estate listings to phone numbers listed on the National Do Not Call Registry ("DNC Registry"). KWRI, a Texas corporation, moves to dismiss, arguing that because it does not have sufficient contacts with and has not purposefully directed conduct at the Commonwealth of Pennsylvania, it is not subject to personal jurisdiction.[2] Havassy counters that KWRI's license agreements with real estate companies in Pennsylvania and receipt of revenue from them are sufficient contacts with Pennsylvania to justify exercising personal jurisdiction over it.

        We conclude that KWRI is not subject to general jurisdiction, but is subject to specific jurisdiction. Therefore, we shall deny KWRI's motion to dismiss for lack of personal jurisdiction.

---

[1] 47 U.S.C. § 227(b)-(c).

[2] KWRI also moves to dismiss based on the plaintiff's general releases given in settlement of actions against Keller Williams realtors. We address that issue later.

## Background

To avoid receiving unwanted telemarketing and solicitation calls, Havassy registered his two cell phone numbers on the DNC Registry.[3] On December 11, 2018, he received six voicemails from Peter Hewitt and six from Kelly Houston, realtors who identified themselves as part of the Peter Hewitt Team with Keller Williams, seeking to list his home for sale.[4] The next day, he received four voicemails from Hewitt and two from Houston.[5] On December 18, 2018, he received four voicemails from Hewitt and two from Houston.[6] In total, Havassy received 24 voicemails consisting of two prerecorded messages.[7] Havassy did not consent to these solicitation calls and had no prior business relationship with KWRI.[8]

Havassy filed his complaint against KWRI in the Lehigh County Court of Common Pleas.[9] After KWRI removed the case to this Court,[10] he filed his First Amended Complaint, adding Hewitt and Houston as defendants.[11] KWRI filed a motion to dismiss or, in the alternative, to transfer to the Western District of Texas.[12] Hewitt and Houston

---

[3] Second Am. Class Action Compl., ¶¶ 58-59, ECF No. 56 ["Compl."].

[4] *Id.* ¶¶ 79, 81, 83.

[5] *Id.* ¶ 83.

[6] *Id.*

[7] *Id.* ¶ 78.

[8] *Id.* ¶¶ 66, 77.

[9] Class Action Compl. and Demand for Jury Trial (attached to Notice of Removal, ECF No. 1 ["Notice of Removal"] as Ex. A, ECF No. 1-1).

[10] Notice of Removal.

[11] First Am. Class Action Compl., ECF No. 22. Hewitt and Houston do not argue lack of personal jurisdiction.

[12] Def. Keller Williams Realty Inc.'s Mot. to Dismiss, ECF No. 25.

filed motions to dismiss, raising the defense of release.[13]  With permission, the parties conducted jurisdictional discovery and submitted supplemental briefing on the issue of personal jurisdiction.[14]

The case was transferred to the Western District of Texas based on the first-to-file rule.[15]  That Court dismissed the claims against Hewitt and Houston for lack of personal jurisdiction.[16]  The case was then consolidated with three other TCPA class actions against KWRI.[17]

KWRI reached a settlement in a nationwide class action in Florida state court.[18]  Claims based on calls from Peter Hewitt and Kelly Houston were expressly excluded from the settlement.[19]  On July 12, 2023, the Western District of Texas transferred the case back to this Court.[20]  Havassy then filed a Second Amended Complaint to include Houston and Hewitt as defendants again.[21]  KWRI responded by moving to dismiss for lack of personal jurisdiction.

## Standard of Review

Lack of personal jurisdiction is raised under Fed. R. Civ. P. 12(b)(2).  Unlike with Rule 12(b)(6), the scope of review under Rule 12(b)(2) is not limited to the face of the

---

[13] Mot. of Defs., Peter Hewitt and Kelly Houston, to Dismiss Pl.'s First Am. Class Action Compl., ECF No. 32.

[14] Pl.'s Suppl. Mem. Regarding Personal Jurisdiction, ECF No. 43; Def. KWRI's Suppl. Mem. of Law on the Issue of Personal Jurisdiction Pursuant to DE#40, ECF No. 44 ["KWRI's Brief"]

[15] Mem. Op., ECF No. 48; Order, ECF No. 49.

[16] Order, *Wright v Keller Williams Realty, Inc.,* No. 1:18-cv-775 (W.D. Tex.), ECF No. 72.

[17] Order, No. 1:18-cv-775, ECF No. 73.

[18] Order Granting Final Approval to Class Action Settlement and Final J. (attached to Pl.'s Mot. for a Scheduling Conference, ECF No. 1 as Ex. B, ECF No. 52-2).

[19] *Id.* at p. 2, item 4(a).

[20] Order, ECF No. 51.

[21] *See* Compl.

pleadings. Once a defendant challenges personal jurisdiction, the burden is on the plaintiff to prove that jurisdiction is proper. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009). The plaintiff can meet his burden by submitting affidavits or other competent evidence. *Id.*

If there is no evidentiary hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction. *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018). In determining whether the plaintiff has made this *prima facie* showing, we accept the allegations in affidavits and other evidence submitted as true and construe all factual disputes in the plaintiff's favor. *Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 113 n.5 (3d Cir. 2020); *see also Aldossari on Behalf of Aldossari v. Ripp,* 49 F.4th 236, 256 n.31 (3d Cir. 2022). If the jurisdictional facts remain in dispute later in the litigation, we may revisit the jurisdictional question. *Shuker*, 885 F.3d at 781 (citing *Metcalfe*, 566 F.3d at 331, 336). At that stage, we consider the evidence presented by both parties and decide the factual disputes in light of the plaintiff's burden to establish jurisdiction by a preponderance of the evidence. *Metcalfe*, 566 F.3d at 331, 336 (citing *Carteret Sav. Bank, F.A. v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992)).

## Analysis

### General Jurisdiction

There are two types of personal jurisdiction, general and specific. The focus of general jurisdiction is the relationship between the defendant and the forum state, not the relationship of the claims to the forum. *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cty.*, 582 U.S. 255, 262 (2017) (citing *Walden v. Fiore*, 571 U.S. 277, 283-86 (2014)).

General jurisdiction over a foreign corporation exists where the corporation is "essentially at home" in the forum state. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352 (2021) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).  Absent consent, a court may assert jurisdiction over a corporation "only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.'" *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (internal citation omitted).  The state of incorporation and the principal place of business are "paradig[m] … bases for general jurisdiction."  *Id.* at 137 (internal citation omitted).  That a defendant "engages in a substantial, continuous and systematic course of business" is the test for specific, not general, personal jurisdiction.  *Id.* at 138-39.  As the *Daimler* Court explained, "the words 'continuous and systematic' were used in *International Shoe* to describe instances in which the exercise of *specific* jurisdiction would be appropriate … the inquiry … is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous or systematic,' it is whether that corporation [is] … 'at home.'"  *Id.* (emphasis in original).

Jurisdictional discovery revealed the following facts.  KWRI is incorporated in and has its principal place of business in Texas.[22]  It is not registered to do business in Pennsylvania.[23]  It does not maintain any license or certification from Pennsylvania

---

[22] Aff. of Ann Yett ¶ 2 (attached to KWRI's Mot. to Dismiss as Ex. B, ECF No. 25-3).

[23] *See* Def. KWRI's Answers to Pl.'s Interrogs. in Connection with Jurisdictional Discovery ¶ 10 (attached to KWRI's Brief as Ex. A, ECF 44-1) ["Answers"].

5

authorizing it to do business here.[24]  It has no Pennsylvania offices.[25]  It has 16 Pennsylvania employees who work from home.[26]

KWRI does not have offices, own real estate, or maintain bank accounts in Pennsylvania.[27]  It insists it is a franchisor, not a real estate broker.[28]  It does not own or operate any real estate companies in Pennsylvania.[29]  Each real estate market center is independently owned and operated.  The franchisees contract with real estate agents.[30]  KWRI is not a party to those contracts.[31]

KWRI has agreements with 121 market centers in Pennsylvania.[32]  The franchisees sold over 160,000 properties in Pennsylvania during the class period under the KWRI banner.[33]  The franchisees, who pay royalties to KWRI through a profit-sharing arrangement, employ realtors as independent contractors.[34]  During the class period, KWRI received at least 14 million dollars in royalty income from Pennsylvania real estate sales.[35]

---

[24] *Id.* ¶ 10.

[25] Aff. of Ann Yett ¶ 5.

[26] *Id.* ¶ 4; Answers ¶ 14.

[27] Aff. of Ann Yett ¶ 5-6.

[28] Answers ¶ 1.

[29] *Id.*

[30] *Id.* KWRI refers to itself at times as a licensor.  We use the term franchisor and franchisee to refer to KWRI and its market centers.  Oral Arg. Tr., ["Tr."] Feb. 27, 2024, 6:19-22, 7:5-7.

[31] Answers ¶ 1.

[32] Tr. 12:5.

[33] Answers ¶ 1.

[34] *Id.*

[35] *Id.* ¶ 2.

KWRI has employees in Pennsylvania who work from home and not from office locations in Pennsylvania.[36] It does not receive direct commission revenue from real estate sales in Pennsylvania.[37] The revenue it receives from Pennsylvania sales is in the form of royalties paid by franchisees and accounts for 3% of its gross revenue.[38]

Doing business in a state is not a sufficient basis for general jurisdiction unless that business is so constant and pervasive "as to render [it] essentially at home in the forum State." *Daimler AG*, 571 U.S. at 122. In *Daimler*, the Supreme Court considered whether the defendant corporation was subject to general personal jurisdiction in California based on the presence of its indirect subsidiary, an independent contractor, which had multiple offices in California that generated sales accounting for 2.4% of Daimler's sales. *Id.* at 123. The Court found that, even assuming the subsidiary was subject to general personal jurisdiction in California and its contacts were attributable to Daimler, those facts were not enough to deem Daimler "at home" in California for purposes of general personal jurisdiction. *Id.* at 136.

Similarly, KWRI enters into licensing agreements with real estate brokers in Pennsylvania. The royalties paid to it by these franchisees represent only three percent of KWRI's total revenue. This is not enough to deem KWRI "at home" in Pennsylvania.

That KWRI has a website accessible in Pennsylvania does not supply a basis for general personal jurisdiction. Personal jurisdiction based on a website depends on the "nature and quality of commercial activity that an entity conducts over the Internet." *Zippo*

---

[36] Aff. of Ann Yett ¶ 4.

[37] Answers ¶ 2.

[38] Aff. of Ann Yett ¶ 9.

*Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. Jan. 16, 1997).[39] Whether a website supports general jurisdiction depends on "the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Id.* To support general personal jurisdiction, the website must be highly "interactive" and allow customers to enter directly into a contract with the defendant over the internet. The website must either be "central" to the defendant's business in the forum state or specifically target residents of the forum state. *O'Connor v. Sandy Lane Hotel Co.*, No. 04–2436, 2005 WL 994617, at *3 (E.D. Pa. Apr. 28, 2005), *rev'd with respect to specific jurisdiction*, 496 F.3d 312, 317 (3d Cir. 2007) (internal citations omitted).

Whether a non-resident's website itself is sufficient to confer general personal jurisdiction depends on where it fits on the *Zippo* scale of interactivity. In *Zippo*, the district court set out a sliding scale test for determining whether a website alone can constitutionally support the exercise of jurisdiction. The Third Circuit Court of Appeals has endorsed the *Zippo* test. *See Toys "R" Us*, 318 F.3d 452. We apply it here.

At one end of the *Zippo* scale is the interactive website that is used in lieu of face-to-face contact to conduct business with residents in the forum state. In other words, the website is used to transact business.

At the opposite end is the website that is merely an advertising tool to instigate interest. It is not used to communicate the terms of a transaction or to consummate a deal. Nor is it aimed at any particular state. Such a passive site does not create a relationship with the forum state justifying the exercise of jurisdiction. *See Santana*

---

[39] *Zippo* remains the authority on personal jurisdiction based on a website. *Ackourey v. Sonellas Custom Tailors*, 573 F. App'x 208, 211 (3d Cir. 2014) (citing *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 452 (3d Cir. 2003)).

8

*Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 14 F. Supp. 2d 710, 714 (M.D. Pa. July 24, 1998) ("A passive web page, i.e., a web page that merely provides information but through which no business is transacted, will not provide a sufficient basis upon which to base general jurisdiction."); *Cossaboon v. Maine Med. Ctr.*, 600 F.3d 25, 35 (1st Cir. 2010) (holding that the existence of a website visible in the forum that gives information about a company and its products is not enough, without more, to subject a defendant to general jurisdiction).

Between these points is the interactive website where there is some communication between the out-of-state defendant and the state's residents. In such a case, the jurisdictional inquiry focuses on the commercial purpose, the use and level of the interactivity, and the commercial nature of the information exchanged.

KWRI does not use its website to conduct business in Pennsylvania.  The website is informational.  It identifies independent market centers and real estate agents in Pennsylvania and other states.  Visitors to the website cannot interact and conduct business with KWRI through the website.

The KWRI website contains only contact information for agents.  There is no option to do business with or buy or sell a property through KWRI.  Business can be conducted only with the independent realtors on the website.  Considering its limited functionality, KWRI's website alone does not support the exercise of general jurisdiction.

Based on the facts developed in discovery, KWRI cannot be deemed "at home" in Pennsylvania.  Therefore, there is no basis for exercising general jurisdiction over KWRI.

*Specific Jurisdiction*

Specific jurisdiction arises when the cause of action is related to or arises out of the defendant's contacts with the forum and the plaintiff's injury in the forum is related to those contacts. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (quoting *Daimler*, 571 U.S. at 127). The specific jurisdiction inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Walden*, 571 U.S. at 283-84 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (internal quotations omitted)).

There are three requirements for the exercise of specific jurisdiction. First, the defendant's conduct must have been purposefully directed at the forum state, resulting in contacts with the forum. *Ford*, at 359 (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Second, the plaintiff's claim must arise out of or relate to those contacts. *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Third, if the first two requirements are met, the exercise of jurisdiction must comport with "fair play and substantial justice." *Id.* at 358 (citing *International Shoe*, at 316-17).

The first two requirements assess whether a defendant has the requisite minimum contacts with the forum. Although the purposeful direction requirement does not require physical presence in the forum, it does require that the defendant created the contacts with the forum state. *Walden*, 571 U.S. at 284-85 (citing *Burger King*, 471 U.S. at 475-76). The defendant's contacts must be with the forum state itself, not just "with persons who reside there." *Id.* at 285 (citing *Int'l Shoe*, 326 U.S. at 319). In other words, "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the

defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* at 285-86 (citing *Burger King*, 471 U.S. at 478).

KWRI purposely availed itself of the privilege of doing business in Pennsylvania through its activities here. It entered into licensing agreements with realtors in the state who operate under the Keller Williams brand. Those contractual relationships are centered in Pennsylvania. KWRI deliberately reaches out through its advertising to exploit the Pennsylvania real estate market. It derives revenue from the sale of Pennsylvania real estate. Unquestionably, KWRI has created contacts with Pennsylvania from which it benefits, satisfying the purposeful direction requirement.[40]

The relatedness requirement does not demand an absolute causal connection between the defendant's activities and the effects of that activity in the forum. *Ford*, at 1026. However, the relationship among the defendant, the forum, and the litigation "must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden*, 571 U.S. at 284 (citing *Burger King*, 471 U.S. at 475) (emphasis in original). The defendant's conduct must be connected to the forum and the controversy. *Bristol-Myers Squibb*, 582 U.S. at 262 (quoting *Goodyear*, 564 U.S. at 919).

---

[40] In some circuits, although there is no "rigid dividing line" between the two, purposeful availment and purposeful direction are not interchangeable terms. *See Davis v. Cranfield Aero. Sols., Ltd.*, 71 F.4th 1154, 1162 (9th Cir. 2023). In the Third Circuit, at both the appellate and district levels, courts use the terms interchangeably and independent of the type of case. *See, e.g.*, *GE v. Deutz AG*, 270 F.3d 144, 152 (3d Cir. 2001) (evaluating "purposeful direction" in a breach of contract case); *Marten v. Godwin*, 499 F.3d 290, 296 (3d. Cir. 2007) (evaluating "purposeful direction" in a state defamation and federal retaliation case); *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 300 (3d Cir. 2008) (evaluating purposeful direction in a case brought under the Petroleum Marketing Practices Act); *Perrong v. Chase Data Corp.*, No. CV 22-2628, 2024 WL 329933, *3 n.2 (using "purposeful direction" in the TCPA context) (citing *Abramson v. CWS Apt. Homes, LLC*, No. CV 16-426, 2016 WL 6236370, at *4 n.47 (W.D. Pa. Oct. 24, 2016)); *Utz Quality Foods, LLC v. Dirty South BBQ Co., LLC*, No. CV 20-1146, 2020 WL 4334903, *3 (E.D. Pa. July 28, 2020) (using both "purposeful direction" and "purposeful availment" interchangeably in a trademark infringement, unfair competition, and infringement of trade name case); *Greene v. Trans Union LLC*, No. CV 21-4446, 2022 WL 267587, *2 (E.D. Pa. Jan. 28, 2022) (using "purposeful direction" in an FCRA case).

There is a connection between the telemarketing calls and KWRI's forum related conduct. The distinctive "system" KWRI provides its franchisees is designed "to market and provide real estate brokerage services."[41] KWRI requires franchisees to use its "integrated system of software."[42] In turn, the franchisees provide the system to the real estate agents.

KWRI supplies the software database used to generate leads.[43] It retains control over advertising.[44] Franchisees and agents associated with them must adhere to KWRI's policies and guidelines.[45]

KWRI exercises extensive control over its franchisees, imposing its standards and methods.[46] KWRI "requires high standards for its business model, representatives and Licensees."[47] If a franchisee fails to comply with any of KWRI's standards and procedures, KWRI can prevent the market center from doing business.[48] KWRI controls who the franchisee chooses as a Team Leader, as well as the standards for Keller Williams Bethlehem's employees and associates.[49] The Market Center is required to obtain and use approved software and online services from KWRI.[50]

---

[41] Contract: Keller Williams Realty, Inc. and Northampton County Regional Realty, LLC, Definitions 1.57, ECF No. 42 ["Contract"].

[42] *Id.* at Definitions 1.40

[43] *See id.* at Section 5.01(i)(1).

[44] *Id.* at Definitions 1.57; 10.01.

[45] *Id.* at Definitions 1.57.

[46] For example, KWRI dictates details such as amount and type of insurance coverage the market center must have. *Id.* at pp. iv-v, Section 13.

[47] *Id.* at Recitals.

[48] *Id.* at Section 1.01(b).

[49] *Id.* at Section 5.01(f).

[50] *Id.* at Section 5.01(j)(2).

KWRI directs potential customers to real estate agents through a website bearing its name. By doing so, it contacts Pennsylvania real estate owners to obtain listings which potentially result in revenue for KWRI.

Havassy's claims arise out of KWRI's conduct in Pennsylvania. That conduct is connected to the unwanted calls Havassy received. Hewitt and Houston used the KWRI system and the recommended script. Havassy's number was supplied by the KWRI data base.

Havassy maintains that Hewitt and Houston acted as agents of KWRI. He points to KWRI's website, which includes a search function where a user can "Find an Agent."[51] Hewitt is identified as a "luxury" KWRI real estate agent serving Pennsylvania and New Jersey.[52] The website provides contact information for Hewitt at "Market Center – Keller Williams Real Estate."[53] Houston is listed as the "Director of Operations" for the Peter Hewitt team.[54] Both Hewitt and Houston have email addresses that include "kw" for "Keller Williams." Hewitt's LinkedIn profile identifies him as a "Real Estate Agent at Keller Williams Real Estate."[55] His profile lists his current employer as "Keller Williams Realty, Inc."[56] One of Hewitt's LinkedIn profiles states his team was the "#1 team in closed sales

---

[51] KWRI webpage, 2 (attached to Pl's Mem. in Opp. To Defs' Mot. to Dismiss for Lack of Jurisdiction, ECF 30 ["Pl.'s Br."] as Ex. A, ECF 30-2).

[52] KWRI Hewitt Search and Homepage, 3, 5 (attached to Pl.'s Br. as Ex E, ECF 30-6).

[53] *Id.* at 4.

[54] Linkedin Page Houston, 2 (attached as Pl.'s Br. as Ex. G, ECF 30-8).

[55] KWRI page Hewitt, 1 (attached to Pl.'s Br. as Ex. E, ECF 30-7).

[56] *Id.*

volume" at "our Keller Williams Office."[57]  Houston's LinkedIn profile also identifies her as a "Realtor at Keller Williams Real Estate."[58]

KWRI counters that the calls Havassy received were from Hewitt and Houston, not KWRI.[59]  The Peter Hewitt team is affiliated with Northampton County Regional Realty LLC, doing business as Keller Williams Real Estate, which KWRI claims is a separate entity.[60]  That may be so, but that does not mean they are unrelated.  They both use the same name, "Keller Williams."  They both benefit from the Keller Williams brand.

KWRI denies any direct connection between it and Hewitt and Houston, arguing that they work with an independent market center.  KWRI does not require independent realtors to participate in any KWRI training.[61]  KWRI claims Hewitt and Houston, as independent realtors, communicate with customers for their own benefit.[62]  These contentions are belied by the control KWRI dictates in the licensing agreement.

That KWRI employees did not make the phone calls does not mean KWRI had no connection to them.  Houston and Hewitt, as prescribed in KWRI's guidelines, used KWRI's name when they called potential customers and identified themselves as associated with "Keller Williams."[63]  KWRI controls all advertising and marketing that the Keller Williams Bethlehem office and its agents, Houston and Hewitt, perform using

---

[57] *Id.* at 2.

[58] Linkedin Page Houston, 1.

[59] Aff. of Ann Yett ¶ 11.

[60] Pennsylvania license verification for Hewitt and Houston (attached to Decl. of James Havassy, ECF 64, as Ex. A, ECF 64-4). The parties also refer to the office as "Keller Williams Bethlehem."

[61] Answers ¶¶ 7, 9.

[62] *Id.*

[63] Compl. ¶ 43.

KWRI's name.[64] Using the Keller Williams logo and the Keller Williams domain in their email addresses enhances KWRI's brand and consequently its profits.

The agreement governing KWRI's relationship with the Market Center dictates that the franchisees use "the System" in its operations.[65] The System controls how a Market Center provides real estate brokerage services, including advertising and promotional programs.[66] It also governs training on telemarketing methods.[67] KWRI mandates that the Market Center "provide leadership" to the individual realtors and train them in KWRI's business philosophy and culture.[68] The individual realtors are trained by the franchisee "in accordance with the procedures" set out by KWRI,[69] including KWRI's methods and techniques for real estate sales.[70] Hence, we conclude that KWRI's conduct is related to Havassy's claims.

Because KWRI purposefully availed itself of doing business in Pennsylvania and Havassy's claim arises out of KWRI's contacts, we have specific jurisdiction over KWRI. Therefore, we shall deny KWRI's motion to dismiss for lack of personal jurisdiction.

*Release*

The defendants invoke the general release Havassy executed in connection with the consolidated cases against nine real estate agents and a team working out of the

---

[64] Contract, Definitions 1.57, Section 10.

[65] *Id.* at p. 9.

[66] *Id.* at Definitions 1.57.

[67] *Id.* at Section 3.01(b). The contract requires market center leaders and the franchisee's "Principals" (all officers, directors and managers of the market center as well as anyone who has an ownership interest in the market center) and other "designated members" of the group to participate in training provided by KWRI. *Id.* at Section 5.01(h)(1).

[68] *Id.* at Section 5.01(h)(1).

[69] *Id.* at Section 5.01(h)(6).

[70] *Id.*

same Keller Williams Bethlehem office (the "Reglus action").[71]  The release bars all claims that could have been brought in that action. The defendants argue the release covers Havassy's claims against them.  Havassy responds that the calls from Hewitt and Houston occurred after the Reglus action was filed and Pennsylvania procedural rules bar adding new defendants after a complaint is filed.  Consequently, so they argue, the release does not apply to Hewitt and Houston because his claims against them could not have been brought in the state court action.  Havassy also argues that they were not included in the Release because five individual defendant real estate agents were named in a letter accompanying the Release, and Hewitt and Houston were not.

On November 9, 2018, Havassy filed suit against Reginald Reglus and eight other real estate agents and one real estate team, all of whom were affiliated with Keller Williams Bethlehem for alleged violations of the TCPA in ten separate actions.[72]  All ten actions were instituted in the Magisterial District Court in Northampton County, Pennsylvania.[73]  The claims were consolidated.

On February 21, 2019, after a day of trial, Havassy stipulated to the entry of judgment in favor of the defendants.[74]  Havassy and Reglus then executed a release on April 15, 2019.[75]  Havassy released Reglus, as well as

> their current and former insurers, heirs, executors, partners, shareholders, officers, directors, employees, predecessors, successors, affiliates, subsidiaries, parent companies, assigns, attorneys, servants, and agents (hereinafter collectively

---

[71] Northampton Regional Realty LLC does business as Keller Williams Bethlehem.  The parties refer to it as the Keller Williams Bethlehem office.

[72] Defs' Hewitt and Houston's Motion to Dismiss, ECF No. 57, at 4; Compl., ¶¶ 71-73; Magisterial Court Docket (attached to Pl.'s Brief as Ex. A, ECF No. 56-1).

[73] Pl.'s Brief, at 1.

[74] *Id.*

[75] Full and Final Release of all Claims, (attached to First Am. Class Action Compl., ECF No. 22, as Ex. A, ECF No. 22-2).

referred to as "Releasees"), of and from any and all liability, claims, demands, actions, causes of action and suits at law or in equity alleged in, could have been alleged in, or arising out of the action filed in [this court].[76]

Release is an affirmative defense that must be raised in a responsive pleading. It is not a defense that may be asserted by motion. *See* Fed. R. Civ. P. 8(c); *see also* 2 Moore's Federal Practice - Civil § 12.24 (2024); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014); *Robinson v. Johnson*, 313 F.3d 128, 134 (3d Cir. 2002). Rule 12(b) lists seven defenses that may be asserted by motion. Fed. R. Civ. P. 12(b). Release is not one of them. An affirmative defense may not be used to dismiss a plaintiff's complaint. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004).[77] Therefore, we shall deny the motions to dismiss based upon the release.

---

[76] *Id.* at 1.

[77] The Third Circuit has recognized an exception where the complaint reveals the affirmative defense on its face. For example, a party may raise a statute of limitation defense in a Rule 12(b)(6) motion, but only if the bar is apparent on the fact of the complaint. *See Robinson*, 313 F.3d at 135 n.3.

The release defense is not "apparent" on the face of Havassy's complaint. It is unclear from the Complaint whether the Release bars Havassy's claims against Hewitt and Houston. It is uncertain what occurred in Magisterial District Court and what the parties there intended. *See Robinson*, at 134-35 (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978)).